[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
INTRODUCTION
The plaintiff Elizabeth Hayes filed this action against the defendants Yale New Haven Hospital, Alvin Johnson, and Leo Cooney for damages. The plaintiff claims that she was wrongfully terminated from her employment at the defendant hospital. The defendants deny that her termination was wrongful. The matter was claimed to the jury trial list. Thereafter, the parties stipulated to a trial to the court, which proceeded over a period in excess of twenty days beginning on May 22 and ending with summations on July 17, 2001.
THE PARTIES
The plaintiff was the Geriatric Programs Coordinator at the Adler Geriatric Assessment Center at Yale New Haven Hospital at the time she was notified of her release from employment on March 4, 1996. The defendant Yale New Haven Hospital is a large, private hospital in New Haven, Connecticut. The defendant Alvin Johnson was the Vice President of Employee Relations for the hospital. The defendant Leo Cooney, M.D., was section chief of Internal Medicine and was Medical Director of the Continuing Care Unit, which took care of frail elderly persons. He was acting as the interim director of the Adler Geriatric Assessment Center at the time of the events of which the plaintiff complains. Cooney was the plaintiff's direct supervisor at the Adler Center. As used in this memorandum, the "defendant" is the hospital; the individual defendants Johnson and Cooney will be referred to by name.
THE PLEADINGS
The operative complaint is the Fifth Revised Complaint of the plaintiff filed March 2, 2000. It consists of eleven counts. Count Nine, alleging a violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 (a)(1), was the subject of a Motion to Dismiss for Lack of Subject Matter Jurisdiction that was granted (Devlin, J.) on May 10, 2001, in the weeks leading up to trial. The remaining counts as trial CT Page 11032 started were:
Count One: Breach of Implied Contract against Yale New Haven Hospital;
Count Two: Breach of Express Contract against Yale New Haven Hospital;
Count Three: Tortious Interference with Contract against Leo Cooney;
Count Four: Tortious Interference with Contract against Alvin Johnson;
Count Five: Fraud against Yale New Haven Hospital;
Count Six: Promissory Estoppel against Yale New Haven Hospital;
Count Seven: Intentional Infliction of Emotional Distress against all defendants;
Count Eight: Negligent Infliction of Emotional Distress against all defendants;
Count Ten: Discrimination on the basis of race, in violation of Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e, et seq., against Yale New Haven Hospital;
Count Eleven: Retaliation [for having successfully pursued an earlier grievance], in violation of Title VII of the Civil Rights Act,42 U.S.C.A. § 2000e, et seq., against Yale New Haven Hospital.
The defendants filed an updated Answer on May 18, 2001. They essentially admitted that the plaintiff was employed and was then terminated, but they denied all allegations of wrongful conduct on their part and denied any actionable damage to the plaintiff. In addition to denials, they asserted a number of special defenses, the only material one on which they offered evidence being failure to mitigate damages.
THE FACTS
The general facts concerning the plaintiff's claims are set forth below. Further facts as found by the court are contained in the discussion of each Count or Special Defense.
The plaintiff is black.[1] She graduated from high school in her home town of Hemingway, South Carolina, in 1967. She attended junior college in Rock Hill, South Carolina, for one year. Then she moved to Connecticut. In 1968, she worked as a Nurse's Aide at the Hospital of St. Raphael in New Haven. On July 1, 1970, she began working at Yale CT Page 11033 University as a Clerical Assistant in the catalogue/card processing department of the Yale libraries.[2] She was transferred among the library facilities while at Yale and was promoted several times. Her performance evaluations while at Yale University were always satisfactory or better.
While a full time employee at the university, the plaintiff held several part-time jobs. From 1976 to 1980 she worked part-time as an admitting officer at Yale New Haven Hospital. In 1984, she did substitute teaching in the New Haven public schools. Beginning in 1985, she worked as a realtor associate for Fort Hale Realty Company.
In June 1986, she began attending the University of New Haven. She was awarded her B.S. degree in Business Administration and Management Science in January 1988. She thereafter began attending graduate school part-time. In August 1993, she was awarded a Master's Degree in Business Administration from the University of Hartford.
In September 1988, the plaintiff applied for employment at Yale New Haven Hospital. She went through three interviews: first with Rocco Lapenta, who worked for the hospital as a personnel representative/recruiter; second with Patricia Hannon who was a supervisor in the Unit Service Management Department; and third with Norman Roth who was in charge of the Materials Management Department of which the Unit Service Management budget was a part. The plaintiff was hired effective June 19, 1989, for a position as a Unit Service Manager, at a gross annual salary of $31,000, plus benefits. Her status was to be probationary during her first six months of employment.[3]
The Unit Service Management Department was in charge of maintaining most nonnursing functions on patient care units. This included a variety of activities, such as ordering and maintaining inventory levels of supplies of all kinds, from hospital beds to bandages; assigning charges to patient charts for use of consumable supplies; overseeing the cleanliness of patient care areas; transporting patients. The plaintiff was assigned to manage one or more units. Her duties included supervising unit service assistants who performed the functions of stocking supplies and the like.
The plaintiff's performance was the subject of an annual performance appraisal. For the year June 1991 to June 1992, her Management Employee Performance Appraisal was authored by her immediate supervisor at the time, Charlie Wilson. Her overall performance score, on a scale of 2 at the unsatisfactory end to 15 at the superior end, was 7, indicating that her performance was "below expectations." Chief among Mr. Wilson's criticisms of the plaintiff were her management skills. She missed CT Page 11034 deadlines for filing certain reports, assigned personnel in such a way that one unit ran over budget on salary, maintained a disorganized inventory system for one program, and maintained poor communication with the nurse managers on her units with whom coordination was crucial. Mr. Wilson noted that the plaintiff's performance had sharply declined from that of the previous year. Her poor performance in areas of "top priority and importance" had a "very detrimental effect on the department's overall performance and reputation." Exhibit B, p. 1e.
With the approval of his own supervisor and a representative of the human resources department, Mr. Wilson placed the plaintiff on a ninety day Special Performance Review status, so that her work would be closely monitored. The plaintiff was notified in writing that if her performance did not show "immediate and sustained improvement," she was subject to disciplinary action, up to and including termination. Exhibit B, p. 1 e. The plaintiff received a copy of this performance appraisal on October 13, 1992, but refused to sign an acknowledgment of receipt.[4]
Patricia DeWitt replaced Charlie Wilson as the plaintiff's supervisor in October 1992. Within a month, Ms. DeWitt had come to the conclusion that the plaintiff was not showing any improvement and that allowing the plaintiff to retain the position for the full ninety days of the special review period would not make a difference and was likely to damage the credibility of the entire Unit Service Management Department. On November 18, 1992, Patricia DeWitt sent a memo to Charlie Wilson, who had been promoted to Director of Nursing Administrative Services, recommending that the plaintiff be removed as a Unit Service Manager. Mr. Wilson concurred and referred the matter to Art McComb, Administrative Director for Employee Relations, who would be involved in such a termination. No action was taken to remove the plaintiff at that time, however.
The plaintiff's next written performance appraisal, for the period through June 14, 1993, was completed on February 7, 1994. It too was below expectations, but once again no action was taken to terminate her employment or remove her to a position of lesser responsibility in the hospital.
In October 1994, the plaintiff's performance appraisal for the period ending June 13, 1994, rated the plaintiff in the "met expectations" range. That was true again for the performance appraisal period ending June 12, 1995. During those two years, the plaintiff's assigned duties had undergone some substantial changes because of an impending hospital-wide staff reorganization.
The Patient Focused Operational Redesign (PFOR) was instituted through the years 1993-1995 to cut operating costs and increase staff CT Page 11035 efficiency. The entire Unit Service Management Department was phased out. The essential job functions of employees of that unit were, to some extent, combined with others; some were eliminated and others reclassified. The position of Unit Service Manager was eliminated.
In order to lessen the adverse human resources impact of such a restructuring, many non-management employees were to be retrained to qualify for new positions. Employees whose positions were eliminated under the PFOR restructuring were given preference in transferring into new jobs. Those who chose not to apply for a transfer, or who were not qualified for a new position, were given a more attractive layoff package than was available to other employees.[5]
The plaintiff retained the title of Unit Service Manager during the staff restructuring although some of her duties changed. During this period, she was utilized less as a manager and more as a trainer for some of the "PFOR-affected" employees who needed to learn additional or different job duties. She also worked on several special projects, such as implementing the relocation of one unit, that did not require substantial discretionary management responsibilities. As one whose job was to be eliminated under this PFOR restructuring, it was expected during this time that the plaintiff would bid on transfers to other hospital positions for which she was qualified, look for outside employment, or prepare to take the layoff package.[6] By early 1995, the plaintiff had taken few steps to do any of these. Finally in the summer of 1995 when the plaintiff was on notice of layoff, she applied for the posted position of Geriatric Programs Coordinator (GPC).
The GPC job posting stated that the requirements were, at a minimum, an Associates Degree in Business or equivalent experience; three to five years as an office manager and a like period of experience with PC networks; a proficiency at managing databases; and excellent managerial skills. The plaintiff was one of nearly a dozen candidates for the position. A committee of four, of whom the defendant Leo Cooney was one, screened the applications and selected candidates to interview. The committee chose four candidates as the top of the group from among those interviewed. It ranked them in order, and sent those names to human resources for the job offer to be made. The plaintiff was not among the top four, and, as far as Cooney was concerned, was not even in the running because of her past difficulty as a manager.
When the plaintiff learned that she had not been chosen to fill the job, she filed a grievance with Yale New Haven Hospital's Human Resources Department.[7] The grievance was grounded on the hospital policy of giving preference in transfers to those employees like the plaintiff whose jobs had been eliminated under the PFOR reorganization. The CT Page 11036 plaintiff claimed that she fulfilled the minimum qualifications for the GPC position and therefore she was entitled to preference over all other candidates. Among those who supported the plaintiff's policy interpretation was the defendant Alvin Johnson.
The grievance was decided by Diana Weaver, Senior Vice President for Patient Services. The plaintiff's grievance was sustained. The plaintiff was appointed to the position of Geriatric Programs Coordinator. She was officially notified of the terms of her transfer on November 28, 1995, by letter from Rocco Lapenta, although she had been informally notified in mid-October of the success of her grievance. The plaintiff was to be paid an annual salary of $37,500 and to have a probationary period of six months.
This appointment made Dr. Cooney exceedingly unhappy. In his view the hospital policy of favoring a minimally qualified candidate over candidates whom he viewed as superior undermined the delivery of high quality patient care for which the Adler Center was known. Dr. Cooney was particularly concerned because he had become aware that the plaintiff had in the past received low performance appraisal scores. Dr. Cooney let Diana Weaver and Alvin Johnson know in no uncertain terms about his displeasure.
Nonetheless once the plaintiff was appointed to the position, everyone resolved to make the best of it. In an effort to insure that the plaintiff succeeded at the new job, Diana Weaver enlisted Suzanne Boyle, R.N., an experienced manager who was a special projects coordinator in Patient Services, to be a mentor to the plaintiff. Dr. Cooney retained Betty McLellan, the previous Geriatric Programs Coordinator,[8] to return to the hospital to orient the plaintiff on the day to day operations of the Center and to train her in the specific computer programs that the Center used.
The plaintiff met on several occasions with Ms. McLellan before the effective date of transfer — December 4, 1995 — to begin this transition process. The plaintiff also used this time to take three in-house computer courses to improve her computer skills.[9] The staff at the Adler Center, who had been dividing up the duties of the vacant coordinator position for several months, were pleased and relieved to have the plaintiff join the staff
The Adler Geriatric Assessment Center was an outpatient facility that provided a comprehensive, multidisciplinary approach to the diagnosis of the health problems of elderly patients. Patients, most referred through primary care physicians in the community, were brought to the center exhibiting a variety of medical needs that were usually beyond the CT Page 11037 ability of a single specialist to assess. The goal of the Center was to accomplish a thorough work-up of the patient in order to create a treatment plan for that person. The staff would receive the referral from a family member or primary care doctor; a case manager would take an extensive history from a variety of sources; one or more physicians who were specialists in such fields as psychiatry, orthopaedics, geriatrics or other relevant areas, would conduct the necessary physical or mental examinations of, the patient; and this team would help design a treatment program with the patient, the family and the community physician. The Adler Center was a separate cost center at the hospital, so that it needed to run efficiently and keep up a steady census of patients.
The Geriatric Programs Coordinator was responsible for the overall operation of the Adler Center. She had direct supervision over a small staff that, through most of the plaintiff's time there, consisted of one receptionist, one secretary, and two part-time transcriptionists. The plaintiff worked with but did not supervise the four case managers on staff. She coordinated the clerical work of the case managers and of the physicians who performed medical evaluations on the Center's patients.
The plaintiff began to experience difficulty performing some of her job responsibilities right from the start. Within her first four weeks on the job, there were occasions when phone calls referring potential new patients did not receive follow-up, and available appointment slots were not filled; reports and evaluations on patients were not sent out in a timely manner to the patient's primary care physician[10] incoming faxes were not delivered by email or printout to the individual to whom they were addressed; and patient charts had incomplete information. All of these were within the plaintiff's responsibility to oversee.
Dr. Cooney met regularly with the plaintiff to conduct oral discussions about the plaintiff's progress in the job. In addition, Cooney put in writing a series of interim evaluations of the plaintiff's performance and gave these memoranda to her. In a supervision meeting with her on December 29, 1995, Cooney gave the plaintiff the first of these memoranda. At that meeting, orally and in writing, the plaintiff received a detailed description of the inadequacies in her performance during her first four weeks on the job. Cooney told her that she must correct them to be successful.
Again on January 11, 1996, Cooney informed the plaintiff that she was not meeting performance expectations. In addition to continued delays in scheduling appointments for new patients about whom calls had been received, and continued gaps in posting information to patient charts, Cooney noted other problems about which he told the plaintiff. There were inexcusable delays in transcribing dictation of reports and evaluations. CT Page 11038 The plaintiff was not properly referring initial phone calls, to a designated case manager. When the plaintiff covered the front desk, she did not type messages from incoming phone calls directly into the computer system.
On January 19, 1996, Cooney once again provided a detailed explanation to the plaintiff of the deficiencies in her work. He explained that his information came from a number of the staff members of the Center who had identified serious problems with the running of the Center. He urged the plaintiff to become thoroughly competent at all aspects of the management of the Center. He counseled her that if a task wasn't getting done, the plaintiff herself needed to jump in and do it, not simply look for someone to whom to delegate it.
Cooney gave the plaintiff several examples of specific problems. When the receptionist was on a break or out for a day, the plaintiff assigned the transcriptionists to cover the front desk, even if they were behind in completing transcriptions. Three days earlier, when the front desk receptionist was too busy to return phone calls to schedule patient appointments, Cooney had brought this to the plaintiff's attention with the expectation that the plaintiff would immediately follow up and do it herself. Instead the plaintiff gave the list of phone calls to the receptionist and left for the afternoon. The GPC was assigned, among other things, to make corrections to transcriptions, fill out physician reimbursement reports, and obtain information necessary to complete patient charts. The plaintiff consistently asked staff members with other responsibilities to carry out these tasks.
The plaintiff disagreed with Cooney's criticisms. For example, the plaintiff complained to Cooney that covering the front desk was in fact part of the job description of the transcriptionists. Cooney explained that the plaintiff needed to have a broader vision of the functioning of the Center, to set an example for good teamwork, and to provide leadership to the staff in all job descriptions. He also specifically directed her on a number of occasions to cover the desk herself in a crunch, a directive that the plaintiff largely ignored and viewed as interference with her management prerogatives.
During the plaintiff's time at Adler, the staff became increasingly dismayed at the decline in the Center's functioning. This was of particular concern to the case managers who were physically located on the premises and who had the most contact with patients, families and community doctors. Cooney received regular complaints from the case managers about delays and disorganization at the Center. Much of this information came to Cooney via email, a common tool for communication among the staff. In meetings with the plaintiff, Cooney repeatedly told CT Page 11039 her of the staffs concern, and he shared many examples with the plaintiff. On at least two occasions he showed the plaintiff specific written communications he had received about work problems: one (Exhibit R, pp. 2-4) from Nanne Scholhamer, a case manager; and another (Exhibit 95, a copy of which was originally appended to Exhibit 27) from Betty McLellan, whose new consulting business provided services to the Center's computer system and who continued to be on retainer to assist in the transition of work to the new coordinator.
By mid-February, after meeting regularly with the plaintiff to counsel her about her job performance and after giving her four written memoranda about specific areas that needed improvement, Cooney had decided that the plaintiff's performance was so detrimental to the working of the Center that something had to be done. He contacted Lina Perrotti, neé Persky, Manager of Employee Relations, to ask what the alternatives were.[11] Perrotti's answer to Cooney was that the plaintiff was still in her probationary status and that he had the ability to release her[12]
if her performance was inadequate. Cooney, with Perrotti's help, drafted a termination memo.
Cooney attempted to deliver the memo on February 28, 1996, but the plaintiff was on vacation until March 4. On March 4, the plaintiff received the memo, releasing her as of March 30, 1996. On March 7, 1996, the plaintiff filed a grievance.
The plaintiff also sought out Charlie Wilson, her former supervisor who was now the Director of Workforce Diversity at Yale New Haven Hospital, to ask if there was anything he could do to help her. Wilson was in charge of an employee mediation program known as Consulting Pairs, the purpose of which was to defuse conflicts between coworkers. Wilson approached his own supervisor Alvin Johnson to inquire whether the plaintiff's problems in the Adler Center could be helped using the Consulting Pairs program. Wilson also told Johnson that the plaintiff was concerned that she had not been allowed the full six months of probation before being terminated. Because the plaintiff's problems in the Adler Center were performance-related and because she had already been released and had filed a grievance, Johnson determined that there was no further counseling, mediation, or other intervention that the hospital could appropriately provide. Johnson replied that Wilson should not become involved.
The plaintiff's grievance went once again to Diana Weaver, Senior Vice President for Patient Services. Weaver conducted a full investigation and determined that there was no merit to the plaintiff's contention that she had been unfairly evaluated. CT Page 11040
The plaintiff then took her grievance to the next step, where she was entitled to elect that it be heard either by a panel of employees or by Marna Borgstrom, Executive Vice President and Chief Operating Officer for the hospital. The plaintiff chose the latter. After a thorough investigation that included an interview of the plaintiff and persons suggested by the plaintiff, interviews of persons connected to the Adler Center, and a review of documents related to the plaintiff's performance, Borgstrom denied the plaintiff's grievance and upheld the termination.
Both Weaver's and Borgstrom's decisions included an offer to allow the plaintiff to try to transfer as an internal candidate, giving her preference over outside applicants, to any other open positions in the hospital for which she was qualified. Borgstrom's decision also allowed the plaintiff the option, otherwise expired, of choosing the PFOR-related severance package. The plaintiff declined and eventually filed this lawsuit.
COUNT I — BREACH OF IMPLIED CONTRACT AGAINST YALE NEW HAVEN HOSPITAL
The plaintiff alleges that she and the hospital had an oral contract of employment for an indefinite term. Such contracts are recognized in Connecticut law and construed as terminable at will. D'Ulisse-Cupo v.Board of Directors of Notre Dame High School, 202 Conn. 206, 211 n. 1,520 A.2d 217 (1987). The plaintiff alleges that in addition to terms incorporating an agreement about type of job, wages, and hours, her employment contract with the defendant incorporated the provisions of the hospital's employment manual. The provisions of the manual that were breached by the defendant are alleged in the Complaint as follows[13]:
¶ 20a. The plaintiff' discharge was wrongful because the plaintiff "properly and diligently performed her duties under the work agreement;" (The court reads this as a claim that the plaintiff could only be discharged for just cause.)
¶ 20b. The defendant did not provide the plaintiff "the benefit of retraining and education as required under the work agreement" to aid in her transfer to the Geriatric Programs Coordinator position;
¶ 20c. The defendant discharged the plaintiff because of "disparate treatment based on racial considerations;"
¶ 20d. The defendant was discharged in "violation of Section III of the manual entitled `Staff Selection Guidelines' in that plaintiff was not accorded fair and equitable treatment in accordance with said CT Page 11041 guidelines."
¶ 21. The defendant failed to provide the plaintiff with "a full opportunity to complete the six month training and re-education program as provided by the guidelines."
In Count I, the plaintiff alleges reliance on, variously, the hospital's manual, ¶ 7 e.g., guidelines, ¶ 13, 17, e.g., orpolicy ¶ 24b, for her claim of breach of contract. The evidence suggests three sources from which the plaintiff has derived the terms of any such contract.
The Human Resources Manual
Yale New Haven Hospital does have an extensive Human Resources Policy and Procedure Manual. The portions of it that relate to the plaintiff's circumstances are the introductory section, Exhibit FF[14] the section on Orientation Period Policy, Exhibit 3a; Terminations, Exhibit 3b; and Performance Appraisal — Management and Professional Employees, Exhibit 3c.
The plaintiff claims that the relevant sections of this manual constituted essential terms of her employment contract with the defendant. The court finds however that the plaintiff has failed to prove that by promulgating the manual Yale New Haven Hospital agreed to undertake some form of actual contractual commitment to the plaintiff. See, Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1,15 (1995). The manual was not a statement of promises made to the plaintiff or to any other employee, but rather a written description of how the defendant expected its human resources to be deployed.
Moreover, at the time the plaintiff applied for the transfer to the Geriatric Programs Coordinator position, the manual contained clear language disclaiming that it represented a contractual commitment.[15]
As to the particular provisions of the human resources policies utilized in the case of the plaintiff, even if there were a contractual commitment by the defendant to the plaintiff, the defendant did not breach any such commitment to the plaintiff.
1) Dismissal for Just Cause: The first breach of contract claim is that the human resources manual obligates the defendant to dismiss an employee only for just cause. There is no such language in the sections of the manual in evidence in this case. Nor is there any credible evidence that other parts of the manual contain such an obligation.[16]
CT Page 11042
2) Failure to Provide Training: The sole mention of training in the relevant manual sections is in that entitled Orientation Period Policy, which defines that period as a time during which an employee is "oriented and trained to perform the duties required for his/her new position." Exhibit 3a. There is no language further defining what type or amount of training might be appropriate nor any language obligating the defendant to provide such training. Such vague terminology cannot support a claim for breach of contract here.
3) Race Discrimination: The plaintiff's claim of race discrimination is discussed beginning on page 41, infra, of this Memorandum.
4) Violation of the Staff Selection Guidelines: The staff selection guidelines are contained in the PFOR Guidelines and are discussed below.
5) Failure to Allow Plaintiff the Full Six Month Probation Period: The Orientation Period Policy, designated Policy Number C:4 (Exhibit 3a) states the following:
 During the orientation period, any employee who has been counselled [sic] and advised of job performance deficiencies may be released or discharged without further notice after a reasonable time has been allowed for action to correct the deficiencies.
The plaintiff was counseled by Dr. Cooney, advised of job performance deficiencies, and released after a reasonable time had been allowed for her to correct the deficiencies. There was no obligation to allow the plaintiff further time to master the position. The policy does not mandate that an employee is entitled to serve out the entire probationary period.
The PFOR Guidelines
Yale New Haven Hospital also developed the document called Human Resources Guidelines for Patient Focused Operational Redesign. Exhibit 4. The contents of this twenty-six page document seem to be the true focus of the plaintiff's claim to contractual responsibilities of the defendant in this Count and in Count II. These Guidelines contain specific contract disclaimer language on the very first page of text: "Please note these procedures are guidelines only and are subject to revision by the Hospital. They are not intended to create a contract." As to employment security, the Guidelines state: "The Hospital will make every reasonable effort to place an employee whose job is eliminated or modified by the work redesign process. However, the Hospital cannot guarantee a job placement. . . ." Exhibit 4, p. 3 of text. The PFOR CT Page 11043 Guidelines did not constitute a part of any contract with the plaintiff.
As with the main human resources policy, even if there were a contractual commitment created by these Guidelines, the defendant did not breach any such commitment as claimed by the plaintiff.
1) Dismissal for Just Cause: Nothing in the guidelines speaks at all to the issue of dismissal or termination except by layoff. There is no language that can be remotely construed as requiring only just cause terminations.
2) Failure to Provide Training: Although the Guidelines indicate that training will be provided to affected employees, they do not specify any particular type or amount of training. They describe how the Human Resources Department is to coordinate "training referrals" and "[c]oordinate employee's needs with training, as necessary." Exhibit 4, p. 13. But this does no more that delineate which department is responsible for such a function. Later on, the Guidelines state:
 Once employees are selected for positions resulting from the PFOR process, they will undergo training, as needed, to learn the skill/competencies required for the new position.
Exhibit 4, p. 18. The Geriatric Programs coordinator job was not a position resulting from the PFOR process. The coordinator position did not have any new or special training connected with it. To the extent other Unit Service Managers moved into other jobs, they received no special training, but only job orientation as any transferred employee would.
But more substantively, the plaintiff was provided with the opportunity for plenty of training. When she applied for the Geriatric Programs coordinator job in July 21, 1995, she knew there were additional skills she would need to learn for it, chief among them the particular computer program used by the Center and the ability to do local area network (LAN) administration. As to the latter, in the hiatus between learning that she was likely to be awarded the position and her actual start date, she did absolutely nothing to enroll in a LAN administration course or even to investigate the circumstances of doing so. Only after she received her notice of release did she actually ask for and obtain a course list for such training. As to the other computer skills, she had the services of Betty McLellan, former GPC at the Adler Center, who was an expert in the Center's Lotus Notes program. In fact McLellan's new business involved servicing and providing technical support for this computer program. As Dr. Cooney described McLellan, she was the "master" of knowledge in this area who had helped set up the program and had taught everyone in the CT Page 11044 Center to use it. There was no better training available anywhere. The plaintiff did not take advantage of the opportunity to learn these special skills from McLellan.
As for any management skills that were peculiar to the Adler Center, there was no special training for this. What was provided to the plaintiff were the services of Suzanne Boyle, an experienced manager who could work with the plaintiff whenever necessary to help her. The plaintiff, however, did not view the on-the-job services of McLellan or Boyle, or the guidance of Cooney and the plaintiff's other coworkers as "training." As a result she dismissed their good faith efforts to assist her to learn all the necessary new skills for the job. The defendant provided training that was more than adequate for the plaintiff, even though it had no contractual obligation to do so.
3) Race Discrimination: The plaintiff claims that the PFOR guidelines obligated the defendant not to discriminate against the plaintiff on account of race. In the section on Staff Selection Guidelines, there is indeed language which states:
 EEO/AAP — As with all Hospital employment practices, consideration will not be denied to an applicant based on race, age, gender, color, religion, national origin, veteran status or disability. In cases where [there are] two or more applicants with relatively equal qualifications for a position, the Hospital's commitment to affirmative action requires that additional consideration must be given to an individual from an underutilized group as a consideration factor in addition to his or her other qualifications.
But this does no more than state a policy. It does not constitute a contract. Even were it a contract, the defendant's conduct did not constitute race discrimination. See page 41, infra.
4) Violation of the Staff Selection Guidelines: The plaintiff specifically pleads that her discharge resulted from a violation by the defendant of the Staff Selection Guidelines section of the PFOR Guidelines. It is unclear what she means by this. The section on Staff Selection Guidelines describes how staff whose positions were eliminated would be selected for other jobs. The plaintiff was selected for another job, albeit after filing a grievance. If what the plaintiff means by a denial of"fair and equitable treatment in accordance with [this section of the] guidelines" ¶ 20d, is that her grievance was held against her, she could certainly have pleaded that with greater specificity. But CT Page 11045 reading ¶ 20d of the complaint as a claim that these Guidelines prohibit retaliation against an employee for the manner in which she was selected for a new job, the fact is the Guidelines say no such thing. Though fairness might dictate that the defendant ought not do so, there is no contractual undertaking in this section of the Guidelines or anywhere else to select a particular employee for a position, to assist that employee to be successful in any such position, or to treat that employee in a particular way according to how the employee obtained the position.[17]
5) Failure to Allow the Plaintiff the Full Six Month Probationary Period: As to any obligation regarding a probationary period, the Guidelines provide for no other policy than that contained in the regular human resources policy, referring specifically to Policy C:4, already discussed above.
The Statements of Rocco Lapenta
The only other source from which the plaintiff claims the defendant's implied contractual obligations emanate are the statements of Rocco Lapenta, a hospital personnel representative with whom she had an initial employment interview at least six years before the events of which she complains.
The plaintiff's recollection is that during her discussions with Rocco Lapenta in 1989, the plaintiff inquired about how secure she could expect a job at Yale New Haven Hospital to be. Rocco Lapenta told the plaintiff that to his knowledge the hospital was not contemplating any layoffs in the near term.[18]
This was not a misstatement of fact, nor was it a binding promise. Rocco Lapenta did not have authority to establish or modify hospital policy, nor did the plaintiff believe him to have such authority at the time. He had no authority to bind the hospital to any contract with the plaintiff except for the at-will employment contract, the terms of which were contained in his initial letter offering her the Unit Service Manager job. Exhibit YY. The plaintiff did not understand at the time that any rights, contractual or otherwise, other than an at-will employment arrangement were being offered to her. The plaintiff understood at the time she accepted the position and thereafter — from the statements of Mr. Lapenta during the interview process, from her own previous job experience at Yale University, and from the orientation material and other information[19] she received shortly after being hired — that her employment could be terminated at any time, particularly if the hospital determined that she was not performing her job adequately. CT Page 11046
Although oral statements as well as written ones can be the basis for an employer's contractual obligations to an employee, see Torosyan v.Boehringer Ingelheim Pharmaceuticals, Inc., supra, 16, 19, the court does not find that any oral statements made by Lapenta formed the terms of a contract here.
Good Faith and Fair Dealing
Although the court does not find that the Human Resources Manual, the PFOR Guidelines, or the statements of Lapenta supply any additional contract terms, the plaintiff clearly had a contract of employment at will with Yale New Haven Hospital. The plaintiff claims in ¶ 22d that she had a right to expect that the employment relationship would be governed by the concept of good faith and fair dealing that is implicit in every contract. This is a proposition that is likely true, see, e.g.Daley v. Wesleyan University, 63 Conn. App. 119, 127 (2001), but for which the plaintiff provides no legal support. It has not been referred to separately in any of the plaintiff's legal memoranda. Although it is pleaded as a concept," it is tied to no specific conduct of the defendant.
The interpretation of pleadings is always a question of law for the court. Cahill v. Board of Education, 198 Conn. 229, 236, 502 A.2d 410
(1985). The court must attempt to construe the language in the plaintiff's pleadings to ascertain what the plaintiff is complaining about. "Whenever that language fails to define clearly the issues in dispute, the court will put upon it such reasonable construction as will give effect to the pleadings in conformity with the general theory which it was intended to follow, and do substantial justice between the parties. . . . But essential allegations may not be supplied by conjecture or remote implication." Id.
The only thing the court can think of that is not already the topic of a more precise allegation is in relation to the general retaliation claim of the plaintiff: that after she successfully grieved the hospital's failure to select her for the GPC position pursuant to the staff selection section of the PFOR Guidelines, the hospital set out to get rid of her by unfairly evaluating her performance at her new job. This might indeed state a cause of action for breach of a covenant of good faith and fair dealing under an implied contract theory.
The problem is that the court does not find this proved. The court credits the testimony of Cooney and others that, despite the disappointment at not having one of the superior candidates appointed to the post, all involved resolved to make the situation work, to support CT Page 11047 the plaintiff in an effort to have her succeed, and to treat her well and evaluate her fairly in her new job. No retaliation occurred.
The court finds no merit to the plaintiff's claims of breach of an implied contract.
COUNT II — BREACH OF EXPRESS CONTRACT AGAINST YALE NEW HAVEN HOSPITAL
The plaintiff claims that she had an express contract with the defendant hospital that consisted of the relevant portions of the PFOR manual. She claims that the hospital breached this contract, because the hospital:
¶ 32a. did not make a good faith effort to reassign her to a comparable position to the one that she formerly held prior to the restructure process;
¶ 32b. did not retrain and re-educate her for her new position;
¶ 32c. did not provide her with the six month training period as required by the manual;
¶ 32d. did not provide her with the benefits of the affirmative action guidelines; and
¶ 32e. did not pay her the sums due her under the voluntary/involuntary layoff process.
The evidence supports none of these claims.
First and foremost, the court reiterates its finding that the manual entitled Human Resources Guidelines for Patient Focused Operational Redesign did not create any additional contract terms between the hospital and the plaintiff. Beyond that, the specific claims of the plaintiff that the hospital failed to carry out the PFOR policies are without merit.
As part of the PFOR process, an employee whose job was to be eliminated was not simply reassigned to another job. That employee had to identify and apply for any jobs to which she wanted to transfer, as the plaintiff did for the GPC position. After the plaintiff was released from the GPC position, she continued for a time to be eligible to apply as an internal candidate for placement in other hospital jobs. There is evidence that the plaintiff expressed interest to Lina Perrotti in several jobs, but there is no evidence that the plaintiff ever filed an actual job CT Page 11048 application for any new position at the hospital after March 5, 1996. Contrary to the claim in ¶ 32a, there is no evidence that the hospital had an obligation to "reassign" the plaintiff to any particular position or that the hospital interfered with the PFOR process in her case.
As has previously been discussed, the plaintiff's claims in ¶ 32b and ¶ 32c of lack of adherence to the training and the orientation period policies are not supported by the evidence.
As to the claim in ¶ 32d that the defendant did not provide the plaintiff with the benefits of the affirmative action guidelines in the PFOR manual, there is no specific entitlement in the EEO/AAP section of the PFOR manual to any particular benefit. The commitment not to discriminate on the basis of race, contained in this section of the PFOR guidelines, was not violated.
As to the claim in ¶ 32e, there was no evidence concerning the failure to pay out layoff benefits and the court is under the impression that this claim was withdrawn.
COUNT III — TORTIOUS INTERFERENCE WITH CONTRACT AGAINST DEFENDANT LEO COONEY
The court dismissed this count under Conn. P.B. § 15-8 at the close of the plaintiff's case in chief. Cooney is alleged at all relevant times to have been a hospital administrator, an employee of the defendant, and a supervisor at the geriatric clinic. There is no allegation that he was acting outside the scope of his employment during any relevant time, nor does the evidence suggest so.
An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his corporate principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract. Wellington Systems, Inc. v. ReddingGroup, Inc., 49 Conn. App. 152, 168, 714 A.2d 21 (1998), citing Boyce v.American Liberty Insurance Co., 204 F. Sup. 317, 318 (D.Conn. 1962). The plaintiff concedes this to be a correct statement of the law. Plaintiff's Memorandum in Opposition to Motion for Judgment of Dismissal, dated June 28, 2001, p. 10. The plaintiff has failed to plead or prove that Cooney was acting outside the scope of his employment. Therefore, this claim must fail.
COUNT IV — TORTIOUS INTERFERENCE WITH CONTRACT AGAINST ALVIN JOHNSON CT Page 11049
The plaintiff alleges that at all relevant times the defendant Alvin Johnson was a hospital administrator and Vice President of Employee Relations. As with Count III, the plaintiff has failed to plead or prove that Johnson was ever acting outside the scope of his employment in his conduct toward the plaintiff. The court therefore dismissed this count under Conn. P.B. § 15-8 at the close of the plaintiff's case in chief.
COUNT V — FRAUD
The plaintiff alleges that from 1989 to 1996 the hospital made representations "that it would fairly and equitably apply all manual policies and procedures to her," ¶ 45, while it "deliberately, outrageously and maliciously concealed its true intent," ¶ 48, that being to induce the plaintiff to reject other job offers and remain as a hospital employee, ¶ 49, despite the lack of job security.
The elements of fraud are (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. Miller v.Appleby, 183 Conn. 51, 54-55, 438 A.2d 811 (1981). Moreover, fraud is not to be presumed but must be proven by clear and satisfactory evidence, rather than a mere preponderance. Id.
The plaintiff has failed to prove that any false statement of a material fact was made to her by anyone. In particular, the plaintiff has sought to prove that Rocco Lapenta made false statements at her initial interview in 1989. The court finds that Lapenta made no such statements. He did not say that employees could only be terminated for just cause. To the extent that Lapenta made general statements about the lack of impending layoffs or about the reputation of Yale New Haven Hospital as an employer, these did not constitute statements of fact as opposed to opinion, and none was false at the time it was made. Nor did Lapenta believe any such statement he made to be false.
Most especially, such reliance as the plaintiff did place on any statement made by Lapenta was not to her detriment. Rather any belief that she formulated that the hospital would utilize a set of well-defined policies and procedures before undertaking an adverse job action against her was amply and demonstrably carried out in plaintiff's case. The plaintiff has failed to prove fraud.
COUNT VI — PROMISSORY ESTOPPEL AGAINST YALE NEW HAVEN HOSPITAL CT Page 11050
The plaintiff claims that she is entitled to enforce promises of job security made to her by the hospital under the doctrine of promissory estoppel. Recognized in the employment context in D'Ulisse-Cupo v. Boardof Directors of Notre Dame High School, 202 Conn. 206, 213, 520 A.2d 217
(1987), this doctrine is an alternative to a claim sounding in contract. The doctrine recognizes those situations in which a defendant's liability ought to exist because the plaintiff undertook some action that was "induced by reliance upon a promise, despite the absence of common law consideration normally required to bind a promisor." Id., citing Restatement (Second), Contracts § 90 (1973).
The plaintiff does not identify in her complaint the specific source of the promise she claims the hospital made, only that "promises" were made to her "[b]y and through the words, acts, and conduct of hospital and its agents and representatives, as well as its written policies. . . ." ¶ 51. But whatever the source, a "fundamental element is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." Id.
In her brief, the plaintiff points to two sources for such a promise. The first, again, was Rocco Lapenta, and the second was the text of the PFOR Guidelines. The court finds that nothing Mr. Lapenta said was "sufficiently promissory nor sufficiently definite to support contractual liability." Id., 214. A statement that an employer is not presently planning any layoffs does not constitute a binding promise to a particular employee not to lay off that employee at some point in the future.
The relevant portions of the PFOR Guidelines do not contain any such language as would invite reliance by the plaintiff. They describe the defendant's policy of providing general training and support to displaced employees; but no such language is sufficiently precise to support liability for not having provided specific kinds of services to plaintiff.[20]
COUNT VII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS
The court dismissed this count under Conn. P.B. § 15-8 at the close of the plaintiff's case in chief. The elements of a claim of intentional infliction of emotional distress are the following: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.Appleton v. Board of Education of Stonington, 254 Conn. 205, 210 (2000). CT Page 11051 Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Id.
In this case, the plaintiff neither pled nor proved any conduct by the defendants that could remotely be described as extreme or outrageous. Her evidence, if believed, established only that there were several loud, unpleasant meetings, that on one occasion Cooney banged his fist down on a table and that on another occasion he tossed papers in her direction. Conduct on the part of a defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.Id. Accordingly the court dismissed this count.
COUNT VIII — NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS
The plaintiff alleged that her termination "was done in an inconsiderate, humiliating and embarrassing manner," ¶ 58, and that this constituted negligent infliction of emotional distress. The tort requires that the plaintiff plead and prove that a defendant knew or should have known "that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." Buckman v. People Express,Inc., 205 Conn. 166, 173 530 A.2d 596 (1987), citing Montinieri v.Southern New England Telephone Co., 175 Conn. 337, 345, 398 A.2d 1180
(1978).
It is unquestionably true that a job loss, whatever the cause, can result in emotional distress. The plaintiff has failed to prove that any conduct of the defendants created an additional risk that she might suffer an actual illness. Her termination was handled with formality and with as much courtesy as was possible under the circumstances. Her claim that the termination created an unreasonable risk of such distress is without merit.
COUNT IX — VIOLATION OF CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT, CONN. GEN. STAT. § 46a-60 (a)(1)
This claim was dismissed on a Motion to Dismiss for Lack of Subject Matter Jurisdiction before the commencement of trial.
COUNT X — VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,42 U.S.C. § 2000e, et seq.
The plaintiff claims that she was the victim of race discrimination and CT Page 11052 that her release from the job of Geriatric Programs Coordinator for poor performance was a pretext. She alleges that she consistently performed her job in a competent manner.
To establish a prima facie case of race discrimination based on disparate treatment, the plaintiff must show that she was a member of a protected class of persons, that she was qualified for the position, that she was terminated, and that her termination occurred under circumstances that raise a reasonable inference of unlawful discrimination. See,McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). This standard is not inflexible, as "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect in differing factual situations" Id., at 802, n. 13. See, also, Texas Dept. ofCommunity Affairs v. Burdine, 450 U.S. 248, 260 (1981).
If she is able to make out a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for her dismissal. McDonnell Douglas Corp. v. Green, supra, 802. If there is proof of such a reason, the plaintiff in order to prevail must show that the stated reason was a pretext for the underlying "true" reason, that of race discrimination. Id., 804. The purpose of this shifting burden is not formulaic. The ultimate question is always "discrimination vel non."Postal Service Board of Governors v. Aikens, 460 U.S. 711, 714 (1983).
The plaintiff correctly points out in her brief that the plaintiff's proof ought to be reviewed by the court in light of the difficulty of establishing direct evidence of discrimination, noting that defendants "are rarely so cooperative as to include a notation in the personnel file that their actions are discriminatory in nature." Ramseur v. ChaseManhattan Bank, 865 F.2d 460, 464 (2nd Cir. 1989), citing Thornbroughv. Columbus Greenville Railroad Co., 760 F.2d 633, 638 (5th Cir. 1985). Especially with respect to pretext, the court has paid particular attention to the witnesses who wrote unsatisfactory performance appraisals of the plaintiff's work, both before and after her placement in the GPC position. Because the management skills of the plaintiff were the subject of criticism in the hospital's files over a number of years, and because these kinds of skills are particularly susceptible to subjective evaluation, the validity of these criticisms was of special interest to the court. The credibility of those who authored such criticisms was of special interest to the plaintiff as well, and in her argument the plaintiff encouraged the court to view this testimony carefully.
The plaintiff has failed to make out a prima facie case of race discrimination. She has failed to prove that the circumstances of her termination raise an inference of race discrimination. CT Page 11053
The plaintiff's prima facie case consists of the evidence that 1) she is a black female; 2) she was the only black person who was assigned at the time to the Adler Center; 3) her supervisor Leo Cooney was white; 4) after she was released, the job was reposted and a white female was eventually selected to fill the position.
The plaintiff also emphasizes the existence of disparaging "secret memos" sent by white staff members to Dr. Cooney, to raise the inference that there was something pernicious or unlawful going on. She believes these memos were orchestrated by Cooney so that he could create a "paper trail," documenting a poor performance record so that he could fire the plaintiff and install a favored white candidate in her stead. She argues that Cooney, to this end, "micromanaged" her performance of the job in a way he did not with the previous or subsequent white GPCs. She asserts that Cooney did not even use the proper procedure in evaluating her performance, because he failed to set mutually agreeable goals and objectives for her performance as her previous supervisors had done.
The plaintiff submits that all of this leads to the inference that there was a concerted effort to make sure she failed at the job because the defendants did not want a black person to have the job. The court finds this to be contrary to the facts.
The Hiring of Kathy Maturo
One of the original candidates for the Geriatric Programs coordinator job was Kathy Maturo, a white female. Maturo had previously worked in the unit in which Dr. Cooney was a senior physician. Owing to space problems at the hospital, Maturo's work space, for a time, was moved to an office near the Adler Center reception area, so that Maturo knew and was cordial with several staff members there, as well as with Dr. Cooney. Even so, she was not the top candidate for the job in the first instance. She was among the top four names whom the hiring committee submitted to Human Resources for a job offer to be made in September 1995.
The top candidate was Alix Elkins, a white female, who was herself one of the displaced Unit Service Managers. Upon her displacement, Elkins applied for the GPC job and for the job of Coordinator of Volunteers. The latter was apart-time job, which was more to her liking at the time, and Elkins accepted an offer to fill that position. For the GPC job, Maturo was the second choice.
The GPC job was offered to Maturo in September 1995 and then withdrawn because of the plaintiff's grievance. Maturo continued as an employee at Yale New Haven Hospital, working full-time at the hospital as a Care CT Page 11054 Coordination Assistant until mid-April 1996, when she took a leave of absence due to her pregnancy.
The GPC job was reposted in 1996 after the plaintiff was released and the grievance proceedings ended. Maturo saw the new posting in June and filed a new application for the job on June 26, 1996. She did not discuss this application with Cooney. There is no evidence that Cooney was at all involved with the selection of Maturo as the new GPC. In fact by the time Maturo was interviewed for the job in July 1996[21], Cooney had already exited as the interim director of the Center and was himself replaced by Dr. Michael K. McCloud, the new Medical Director of the Adler Center.
Maturo was the successful candidate this time. She did not return to the hospital from maternity leave until mid-August 1996 to begin preparations for transferring to the job at the Adler Center. Maturo successfully completed her probationary period and received work performance appraisals since then that have rated her "far above expectations." Exhibit 68a and 68b.
The plaintiff believes that Maturo received favorable treatment to the plaintiff's disadvantage throughout the relevant period. The plaintiff believes that Maturo had a special relationship with Cooney because she had worked for him as his secretary, that the criticisms of the plaintiff by Cooney were bogus so that the plaintiff could be let go in favor of Maturo, that plaintiff's release from the job was timed to coordinate with Maturo's likely return from maternity leave, and that Maturo's treatment after assuming the job was much more generous than that received by the plaintiff during her tenure there. None of these beliefs is supported by the evidence.
Maturo had no other relationship with Cooney than that of cordial coworker in a section of the hospital in which they frequently encountered one another. He was not her direct supervisor. Cooney's interest was not in placing any particular individual in the GPC position, but in having some competent individual run the Center. His evaluations of the plaintiff's work were valid assessments of her performance and were not designed to create grounds for her release. Maturo's maternity leave was not correlated to the plaintiff's termination. Maturo did not even go out on maternity leave until after the plaintiff was released. Maturo endured unexpected health problems towared the end of her pregnancy. That the date of Maturo's return to take over the GPC position was correlated to the plaintiff's release, or indeed that Maturo's return from maternity leave was even foreseeable at that point, is preposterous. There is no evidence to suggest that Maturo's performance in the GPC job after her placement in the position was inaccurately evaluated by her supervisors or that she received CT Page 11055 benefits or perquisites which would not have been available to any competent employee in the position.
Interestingly even if all of the plaintiff's beliefs about Maturo as a favored candidate were borne out by the evidence, it still is not suggestive of race discrimination. Rather a motive based on a former favorable set of professional interactions is all that one could conclude.
The "Secret Memos"
The court is unpersuaded that there was anything insidious about the "secret memos." First, the generation of written comments documenting incidents of very good or very poor work performance was not out of the ordinary. That such information was communicated to a supervisor, by coworkers or others, by email or otherwise, can hardly be considered an unusual concept in a complex, busy workplace. As a supervisor herself while a Unit Service Manager, the plaintiff had knowledge that such written communications occurred on occasion.
Second the plaintiff was well aware of the information contained in the memos. While in the GPC position, the plaintiff had a number of meetings with Cooney, and in at least four of these meetings he told her of specific incidents of problems on the job, including telling her the names of client files, times of day, and coworkers involved. On two of these occasions, Cooney attached writings generated by others to written performance critiques he gave to the plaintiff. The plaintiff knew that Cooney himself was on site during only part of the work day, owing to the fact that he was the interim director of the Center so that he had substantial duties elsewhere in the hospital. Where could he possibly have gotten the information he shared with her? The only answer is that he was kept informed by the rest of the Center's staff
The plaintiff knew that criticisms of her work performance existed and that this information had been passed on by coworkers to her supervisor. The method of transmitting or retaining the information — by email or written memo — is immaterial and entirely neutral.
Third the accuracy of the information contained in the memos is supported by the evidence. The plaintiff never developed a satisfactory level of skill at managing a busy office. This was a source of frustration to her coworkers who expected everyone to pull together as a team at the Adler Center. To the extent that some of the memos contain unfortunate language about the plaintiff e.g. "more fuel for the fire," in commenting on her job performance, this suggests no racial prejudice, but only annoyance and aggravation that the plaintiff was unable to get CT Page 11056 up to speed on the job.
Finally, to the extent that some of these so-called secret memos were generated by hospital management after Cooney made the decision to release the plaintiff, these likewise evince no race-based motives. The decision of Alvin Johnson, Vice President for Employee Relations, and himself a black person, to support Cooney's decision to release the plaintiff does not suggest any motive to dismiss a black person, but rather to dismiss a substandard employee, whatever the employee's race.
Cooney's Scrutiny of the Plaintiff
Another of the indicia of race discrimination to which the plaintiff points is what she characterizes as the extraordinary scrutiny — the "micromanagement" — to which Cooney subjected the plaintiff. The plaintiff presented evidence that this did not occur with her white predecessor or successor. The plaintiff viewed this scrutiny as an attempt to undercut her authority with her supervisees.
The court finds that there was no unnecessary scrutiny or interference by anyone with the way the plaintiff performed her job. To be sure, there were specific directions to the plaintiff by Cooney about how to utilize, and how not to utilize, staff. The plaintiff was told on more than one occasion not to use the transcriptionists to cover the front desk if there was typing waiting to be done. The plaintiff persisted in directing them to cover the desk anyway. The plaintiff was told on more than one occasion that she, not the receptionist, needed to follow up on certain phone calls. The plaintiff nonetheless gave this work to the receptionist. In the interest of accomplishing the work of the Center, Cooney was extraordinarily explicit with the plaintiff in counseling her about how to get the job done. Such direction was not needed before or since because the previous and subsequent GPCs were able to develop into accomplished managers in a way that eluded the plaintiff. There is no evidence of race discrimination in the way Cooney supervised the plaintiff
Cooney's Evaluation of Plaintiff
The plaintiff believes that Cooney utilized an improper procedure in evaluating her work and that this led to a situation in which she was set up to fail. The plaintiff claims that Cooney was required to create with her a written set of goals and expectations that would be the basis for any evaluation of her work during her probationary period. This does not accord with the evidence however.
The Human Resources Policy and Procedure Manual section on Orientation CT Page 11057 Period Policy, Exhibit 3a, states that the performance standards to be attained during this period are defined by the job description. The practice of creating goals and objectives for future evaluations was not utilized until after the successful completion of the orientation/probationary period. Even Kathy Maturo, whom the plaintiff believes received more favorable treatment than she, did not work with her supervisor to develop a set of goals and objectives, more elaborate than the job description, until nearly a year into the job. Moreover, the development of such a document was first committed to the employee, not the supervisor, as the plaintiff well knew. In her years as a Unit Service Manager, the plaintiff had learned that a draft of a set of goals and objectives for the following year was generated by the employee whose work was to be evaluated, and was refined in consultation with the supervisor. During the plaintiff's months as Geriatric Programs Coordinator, she neither complained about the lack of, nor took any steps to execute, such criteria.
There was nothing else about the manner or duration of the plaintiff's evaluation period that was not in accordance with the hospital's standard procedure. None of this creates any inference of a race-based termination. The court finds that the plaintiff has failed to make out aprima facie case of race discrimination.
Poor Performance as a Pretext
The court will nonetheless address the issue of pretext, which the plaintiff would otherwise have the burden of proving in light of the defendants' credible evidence that the plaintiff was discharged for the legitimate non-discriminatory reason of poor work performance.
Because this is a race discrimination claim it is useful to know the race of those whom the plaintiff believes are responsible for the situation in which she found herself. The defendant Leo Cooney, her direct supervisor whom she asserts unfairly evaluated her management skills, is white. The defendant Alvin Johnson, Vice President of Employee Relations, the administrator who declined to intervene to block her termination, is black. Charlie Wilson, the supervisor who first described her poor management skills and rated her as performing "below expectations" in a performance appraisal, is black. Patricia DeWitt, the next supervisor who also rated the plaintiff's skills as "below expectations" on subsequent performance evaluations, is black.
The identification by Dr. Cooney of the plaintiff's lack of management skills during her probationary period at the Adler Center was remarkably similar to that in the evaluations of the plaintiff's two prior supervisors, Wilson and DeWitt. Those supervisors were both black. They CT Page 11058 lacked any motive to unlawfully discriminate against the plaintiff. In this context, Cooney's assessment does not represent an. aberration. Cooney's evaluation of the plaintiff's work performance appears consistent and credible. The plaintiff's work was unsatisfactory, and it was within the discretion of the defendant to release was her.
The court finds that the defendants have articulated and proved a legitimate nondiscriminatory reason for the plaintiff's termination, namely poor work performance, and the plaintiff has failed to show that this reason is pretextual.
The court finds no violation of Title VII of the Civil Rights Act.
COUNT XI — VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,42 U.S.C. § 2000e, et seq. — RETALIATION
Title VII of the Civil Rights Act makes it unlawful for an employer to retaliate against an employee who has either "opposed any practice made an unlawful employment practice . . . or participated in any manner in an investigation, proceeding, or hearing under this subchapter."42 U.S.C. § 2000e-3 (a). Emphasis supplied. While it is true that the plaintiff initiated a grievance against the defendant for failure to award her the GPC job, her grievance was based solely on the failure of the hospital to follow its own written guidelines for placement of PFOR-affected employees. The grievance raised no issues under Title VII at all. At the close of the plaintiff's case, the evidence was insufficient as a matter of law to support a prima facie case of unlawful retaliation under Title VII. Accordingly the court dismissed this count on the defendants' motion under Conn. P.B. § 15-8.
SPECIAL DEFENSE — FAILURE TO MITIGATE DAMAGES
In the interest of disposing of all issues raised by either side in this matter the court will briefly comment on the defendant's special defense that the plaintiff failed to mitigate damages. This is made somewhat awkward because of the failure of the plaintiff to articulate in her papers any calculation of what she believes her damages to be and the lack of any evidence from the plaintiff or the defendants to show what the going wage was for someone of the plaintiff's background had she located a full-time job after her release.
In 1995, the last complete year the plaintiff worked at Yale New Haven Hospital, her gross income from employment was $33,405 and her adjusted gross income was $14,009.[22] After losing her job in 1996, she continued to manage four rental properties that she owned that operated at a loss. She thereafter derived income from work as a substitute CT Page 11059 teacher in Hamden and New Haven. The plaintiff, for whatever reason, did not make a good faith attempt to seek full-time employment. She certainly did not apply for a number of available local jobs in the healthcare field. Her attempts to search for a job were so sporadic and so highly selective as to guarantee failure.
In a wrongful termination case, the measure, of damages is "the wages the employee would have earned under the [employment] contract, minus any wages which [she] has earned or could have earned elsewhere, and the burden of proof of the latter is on the employer." Torosyan v. BoehringerIngelheim Pharmaceuticals, Inc., 234 Conn. 1, 32-33 (1995), citing Carterv. Bartek, 142 Conn. 448, 451-52, 114 A.2d 923 (1955).
The defendant has proved that the plaintiff failed to mitigate damages. The court finds that it is more likely than not that had the plaintiff made a consistent, reasonable effort to become re-employed in the period after her job loss, given her educational background and over twenty-five years of steady employment, she would have found a suitable position, if not at her previous wage, then at an amount close to it.
Because the court has found that the plaintiff has failed to prevail on any of the counts in her complaint, the court need not analyze further the damages of the plaintiff.
CONCLUSION
The plaintiff has failed to prove any of the claims against any of the defendants. Accordingly the court finds for the defendants on all counts and against the plaintiff, and enters judgment accordingly.
Patty Jenkins Pittman, Judge